George M. WHITESIDE, III, and Donna A. Whiteside, his wife, Plaintiffs,

v.

NEW CASTLE MUTUAL INSURANCE COMPANY, a Delaware corporation, and Downs & Company, a Delaware corporation, Defendants.

Civ. A. No. 83–59 MMS.

United States District Court, D. Delaware.

Oct. 22, 1984.

Clark W. Furlow, Katzenstein & Furlow, Wilmington, Del., for plaintiffs.

John C. Phillips, Jr., Wilmington, Del., for defendant New Castle Mut. Ins. Co.

Allen M. Terrell, Jr., and Thomas A. Beck, Richards, Layton & Finger, Wilmington, Del., for defendant Downs & Co.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Plaintiffs George and Donna Whiteside ("the Whitesides") brought this diversity action against defendants New Castle Mutual Insurance Company ("New Castle Mutual") and Downs & Company ("Downs") to recover money owed them under a homeowners' insurance policy issued by defendants. Presently before the Court is defendant Downs' motion for summary judgment, or, in the alternative, to dismiss the plaintiffs' claim for attorney's fees. For the reasons stated below, defendant's motion will be denied.

### I. Facts

For purposes of this motion, the facts are undisputed. The Whitesides first obtained a New Castle Mutual homeowners' insurance policy on their Pennsylvania home through Downs in April, 1972. The policy gave them unlimited protection against the theft of silver items. For the next four years, this policy was renewed annually when Downs mailed the Whitesides a premium invoice and the Whitesides mailed Downs a payment. In 1977, Downs renewed the Whitesides' coverage by sending the Whitesides an invoice and a new policy that reflected a change in New Castle Mutual's policy form. This coverage was renewed by invoice in 1978. In April, 1979, Downs sent plaintiffs a new policy and a cover letter stating only that the enclosed policy "renew[ed] the coverage" for another year.

This new policy, however, differed from the previous policy in that it limited the insurer's liability for the theft of silver items to $1000. This change in policy terms was not called to the Whitesides'

attention by separate notice, although that was Downs' usual practice. The only notice plaintiffs had of this reduction in coverage was in the change of terms of the policy itself, but plaintiffs never read the new policy.

The Whitesides' coverage was renewed by premium invoice in April, 1980 and 1981. In early 1982, their home was burglarized and silver items worth over $26,000 were stolen. When they called New Castle Mutual to report the theft, plaintiffs learned for the first time that the policy imposed a $1000 limit for theft of silver items. Plaintiffs then instituted this action to recover on the policy for the value of the stolen silver. Upon completion of discovery, Downs filed the instant motion for summary judgment, alleging that the plaintiffs' claim on the policy must be denied because of the $1000 limitation on liability, of which plaintiffs had adequate notice. Downs has also moved, in the alternative, to dismiss plaintiffs' claim for attorney's fees because the statute creating a right to fees does not apply to plaintiffs.

## II. Summary Judgment on the Policy

■ A threshold issue is which forum's law to apply to the insurance contract. A federal court in a diversity case must apply the conflict of laws rules of the state in which it is sitting in order to determine the relevant law. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This Court has recently stated that the Delaware courts in contract actions are moving toward the flexible "most significant relationship to the transaction" test set forth in section 188 of the *Restatement (Second) of Conflict of Laws*. *Hill v. Equitable Trust Co.*, 562 F.Supp. 1324, 1334 (D.Del.1983); *Phoenix Canada Oil Co. v. Texaco, Inc.*, 560 F.Supp. 1372, 1379 (D.Del.1983); *see Oliver B. Cannon and*

*Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160, 1166 (Del.1978). The factors that the Court must consider in order to determine the state with the most significant relationship to the transaction include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Restatement (Second) of Conflict of Laws* § 188(2). Although the information presented concerning factors (a), (b), (c), and (e) is equivocal, the crucial factor in a property insurance dispute is the location of the insured property—in this case, the plaintiffs' house in Pennsylvania. *See Restatement (Second) of Conflicts of Laws* § 188, comment e, at 581; *see also id.* § 193. Moreover, the policy contains, in an endorsement, certain terms required by Pennsylvania law. It would be anomalous to apply Delaware law to a contract dictated in part by Pennsylvania law. Accordingly, Pennsylvania law will be applied to the contract issue.[1]

■ Both parties recognize that the crucial issue is whether the Whitesides received adequate notice of the change in policy terms effected as part of the 1979 renewal. The rule in Pennsylvania and other jurisdictions is that "[t]he delivery of the policy as a renewal, in the absence of notice or explanation that the terms of the policy had been altered, contemplate[s] the same terms and conditions as the existing insurance." *Schock v. Pennsylvania Township Mutual Fire Ins. Ass'n*, 148 Pa. Super. 77, 24 A.2d 741, 743 (1942); *see Overholt v. Reliance Ins. Co. of Philadelphia*, 319 Pa. 340, 179 A. 554, 557 (1935); *see also* Annot., 91 A.L.R.2d 546, 549 (1961); 18 *Couch on Insurance 2d* § 68:64 (rev. ed. 1983); 13A Appleman, *Insurance Law and Practice* § 7648, at 452–54 (1976).

---

1. Defendant Downs barely contests this conclusion. *See* Defendant Downs & Company's Reply Brief In Support Of Its Motion To Dismiss Or, In The Alternative, For Summary Judgment, at 2. Moreover, the choice of Pennsylvania law, rather than Delaware law, appears to have little

practical impact. Although no Delaware court has addressed this issue, Delaware courts would be likely to follow the Pennsylvania standard, which is accepted in virtually all jurisdictions. *See* Annot., 91 A.L.R.2d 546 (1963); 43 Am. Jur.2d Insurance § 448 (1982).

In ordinary circumstances, the insured has no duty to read a renewal policy sent to him or her, and may assume that the renewed policy contains the same terms and conditions as the previous policy. *Schock*, 24 A.2d at 743; *see* Annot., 91 A.L.R.2d at 558; *Government Employees Ins. Co. v. United States*, 400 F.2d 172, 175 (10th Cir. 1968).

Defendant Downs does not dispute the validity of this rule, but contends that the Whitesides received adequate notice of the change in policy terms when they received their policy in the mail, because the manner of renewing the policy changed. According to Downs' argument, the usual manner of renewing the policy before 1979 was the mere mailing of a premium notice, whereas the 1979 renewal notice contained the new and different policy. The inclusion of the policy, Downs reasons, should have alerted the Whitesides to the fact that their policy was being changed, and the Whitesides therefore should have read this new policy. In support of its argument, Downs cites two cases from other jurisdictions, *Thomson v. Southern Mutual Ins. Co.*, 90 Ga. 78, 15 S.E. 652 (1892) (per curiam), and *Epstein v. Northwestern National Ins. Co.*, 267 Mass. 571, 166 N.E. 749 (1929).

■ Downs' argument is not supported by the facts or by the weight of authority. First, this case is factually distinct from *Thomson* and *Epstein*, because the Whitesides received, along with the new policy, a cover letter from Downs stating that the enclosed policy "renew[ed] the coverage for a further period of one year." Hammond Deposition, Plaintiffs' Exhibit 8. The Whitesides relied on this letter and, for that reason, failed to read the renewal policy. Even assuming that a change in the manner of renewal should lead insureds to infer that the policy has changed, the statement in the cover letter assuring the Whitesides that this policy renewed their coverage negates that inference. *See* 18

*Couch on Insurance 2d* § 68:64, at 67 (rev. ed. 1983).

■ Moreover, the weight of authority does not support Downs' contention that a change in the manner of renewal is adequate notice of a change in policy terms. The Pennsylvania cases call for direct, specific notice of policy changes, *see Schock*, 24 A.2d at 743; *Overholt*, 179 A. at 557, and Downs' inferential approach would not satisfy that standard. The Pennsylvania rule comports with the modern cases decided since *Thomson* and *Epstein*. Those cases require the mailing of a separate explanatory notice of policy changes, and not just the mailing of the new policy itself, in order to effectuate a change in policy terms, because "it is inequitable to require an insured to search the fine print of each renewal policy." *Government Employees Ins. Co. v. United States*, 400 F.2d at 175. *See also Aetna Ins. Co. v. Lythgoe*, 618 P.2d 1057, 1059 (Wyo.1980); *Gaston-Lincoln Transit, Inc. v. Maryland Casualty Co.*, 285 N.C. 541, 206 S.E.2d 155, 161 (1974); *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 574-75 (Minn.1977); *Bauman v. Royal Indemnity Co.*, 36 N.J. 12, 174 A.2d 585 (1961). As the Pennsylvania Supreme Court stated: "If the company intended in the new policy to alter the terms of this old one, it should have made its intentions evident." *Overholt*, 179 A. at 557. The mailing of the policy was not enough to make Downs' intentions evident. If that was the only notice the Whitesides received, they were entitled to assume that the policy terms remained unchanged and that they had unlimited coverage against the theft of silver. Accordingly, Downs' motion for summary judgment will be denied.[2]

### III. Attorney's Fees Claim

In their complaint, plaintiffs have claimed, based on 18 *Del.C.* § 4102, that they will be entitled to an award of attor-

---

**2.** Downs has also argued, without citation of authority, that this action is barred by plaintiffs' laches in failing to read their policy from 1979 to 1982. The doctrine of laches, however, does not bar the recovery of a plaintiff who fails to read a renewal policy for a long period of time after receiving it. *Overholt*, 179 A. at 557.

ney's fees if they prevail in this action. Defendant Downs has moved to dismiss this claim on two grounds: (1) 18 *Del.C.* § 4102 is inapplicable because the law of Pennsylvania, not Delaware, applies to this action; (2) 18 *Del.C.* § 4102 only applies to plaintiffs who are Delaware residents, and the Whitesides are Pennsylvania residents.

The basis for Downs' first argument is that 18 *Del.C.* § 4102 is "procedural" and inapplicable because federal courts apply their own procedural rules. If this provision is substantive, Downs claims, it is inapplicable because Pennsylvania substantive law applies to this case. Downs' argument ignores that the terms "substantive" and "procedural" have different meanings dependent upon the context in which they are used. Professor Moore has clarified the distinction:

> Under general conflict of laws principles, matters of procedure are usually governed by the internal law of the forum state even if the conflict of laws rules of the forum require that the law of another state apply to the substantive issued [sic] in the case. This principle should not be confused with the substantive-procedural distinction under the *Erie* rule. For example, ... questions of the burden of proof are substantive within *Erie,* and thus the federal court must follow the law of the forum state regarding such questions. But under the forum state's conflict of laws rules, the burden of proof may be considered procedural, in which case, the internal law of the forum state would ultimately be applied by the federal court, even if, under the forum's conflict of laws rules, the law of another state would be applied to other issues in the case.

1A, Pt. 2 *Moore's Federal Practice,* ¶ 0.311[1], at 3165–66 (2d ed. 1983) (footnotes omitted). Under *Erie* principles, attorney's fees are considered substantive and controlled by state law in diversity cases. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975); *Montgomery Ward & Co. v. Pacif-*

*ic Indemnity Co.,* 557 F.2d 51, 56 (3d Cir. 1977). To determine which state's law on attorney's fees governs in this case, Delaware conflict of laws rules must be consulted. *Klaxon Co. v. Stentor Electric Manufacturing Co., supra.* Under Delaware conflicts rules, attorney's fees are considered "procedural" (in the conflicts sense), and Delaware courts apply Delaware attorney's fees provisions. *Chester v. Assiniboia Corp.,* 355 A.2d 880, 882 (Del.1976). It follows that the law of Delaware on attorney's fees—18 *Del.C.* § 4102 —does apply to this action.

Downs' second contention is more troubling. Downs contends only Delaware residents can recover attorney's fees under 18 *Del.C.* § 4102. The statute, on its face, contains no such limitation. It provides:

> The court upon rendering judgment against any insurer upon any policy of property insurance, as "property" insurance is defined in § 904 of this title, shall allow the plaintiff a reasonable sum as attorney's fees to be taxed as part of the costs.

18 *Del.C.* § 4102. However, the Delaware Supreme Court, in *Chester v. Assiniboia Corp., supra,* stated: "The Trial Court concluded that the intent of the statute is that reasonable attorney fees should be awarded as part of costs when plaintiff is a Delaware corporation (or resident) and a contract dispute is litigated here. We agree." 355 A.2d at 882.

Although this language seems controlling, there are several reasons why Downs' reading of it should not be followed. First, neither the trial court nor the Supreme Court was directly confronted with the issue at hand, because the plaintiff in *Chester* was a Delaware resident. Indeed, no Delaware court has denied fees to non-resident plaintiffs in any reported case. Second, the quoted statement only *implies,* but does not state clearly, that non-resident plaintiffs cannot recover. . Finally, the statute on its face does not limit recovery to Delaware residents, and prior versions of the statute do not indicate that only Delaware resident plaintiffs may re-

cover attorney's fees. *See* 18 *Del.C.* § 1105 (1953); 45 *Del.Laws* ch. 81 (1945); *Del.C.* § 511 (1935); 37 *Del.Laws* ch. 52, § 50 (1931); 18 *Del.Laws* ch. 695, § 3 (1889). Aside from the dictum in *Chester*, there is no support for barring non-resident plaintiffs from recovering Delaware statutory attorney's fees. These reasons compel the conclusion that the Delaware Supreme Court, when confronted with the issue, would not bar non-resident plaintiffs from recovering attorney's fees and would not follow the implications of the *Chester* dictum. Defendant Downs' motion to dismiss plaintiffs' claim for attorney's fees will be denied.