CIGNA INSURANCE COMPANY, Plaintiff,

v.

DIDIMOI PROPERTY HOLDINGS, N.V. and General Electric Capital Corporation, Defendants.

Didimoi Property Holdings, N.V. and General Electric Capital Corporation, Plaintiffs,

v.

Cigna Insurance Company, Defendant.

Nos. Civ.A. 00-186-JJF, 99-605-JJF.

United States District Court, D. Delaware.

March 17, 2000.

Charles M. Oberly, III, Kathleen J. Jennings, Oberly & Jennings P.A., Wilmington, Delaware, of counsel Henry R. Daar, Peter E. Kanaris, Daar, Fisher, Kanaris & Vanek, P.C., Chicago, Illinois, for CIGNA Insurance Company.

Jeffrey M. Weiner, Law Offices of Jeffrey W. Weiner, Wilmington, Delaware, of counsel Joseph P. Dougher, Joseph J. McGovern, Louis B. Kupperman, Obermayer Rebmann Maxwell & Hippel LLP, Philadelphia, Pennsylvania, for Didimoi Property Holdings, N.V.

R. Franklin Balotti, Frederick L. Cottrell, III, Richards, Layton & Finger, P.A., Wilmington, Delaware, of counsel Jerold S. Solovy, Donald R. Harris, Michael T. Brody, Jennifer & Block, Chicago, Illinois, for General Electric Capital Corporation.

## OPINION

FARNAN, District Judge.

Presently before the Court are two sets of Cross–Motions For Declaratory Judgment filed by the parties, Didimoi Property Holdings, N.V. ("Didimoi") and General Electric Capital Corporation ("GECC") and CIGNA Insurance Company ("CIGNA"). In the first set of Cross–Motions For Declaratory Judgment, the parties request the Court to determine the scope of the "appraisal" provision in Insurance Policy No. FSU D33679449 (the "Policy") (D.I. 27, 32 in Civil Action No. 99–605–JJF). In the second set of Cross–Motions For Declaratory Judgment, the parties request the Court to determine the maximum liability of CIGNA [1] under the Policy (D.I. 62, 64 in Civil Action No. 00–186 Consolidated). For the reasons set forth below, CIGNA's Cross–Motion For Declaratory Judgment on the scope of the appraisal (D.I. 32) will be granted and Didimoi and GECC's Cross–Motion For Declaratory Judgment on the scope of the appraisal (D.I. 27) will be denied. Further, Didimoi and GECC's Cross–Motion For Declaratory Judgment on the maximum liability of CIGNA under the Policy (D.I. 62) will be granted and CIGNA's Cross–Motion For Declaratory Judgment on the maximum liability under the Policy (D.I. 64) will be denied. Consistent with these rulings, the Court will enter an order requiring the appraisers to determine (1) the value of the replacement cost of the Delaware Trust Building (the "Building") at the date and time of the fire; (2) the actual cash

1. Since the filing of the appraisal motion, there has apparently been a change in CIGNA's name from CIGNA Insurance Company to ACE USA. Although this change has been reflected in the party's subsequent filings, it has not been reflected on the docket for the purposes of changing the case caption in this matter. For consistency, the Court will refer to CIGNA n/k/a ACE USA as "CIGNA" throughout this Opinion.

value of the Building due to the fire loss; (3) the cost to repair and/or replace the fire damage to the Building; (4) the amount of the loss caused by the enforcement of any ordinance or law; (5) the amount of loss to clean up and remove asbestos containing materials and/or asbestos fibers as a result of the fire; (6) the period of time required to repair the Building to its pre-fire condition without regard as to when the construction starts; and (7) the length of time required to complete the work required by the enforcement of any law or ordinance. As for the maximum liability of CIGNA under the Policy, the Court will enter an order setting forth the sum of $91,186,163 as the maximum liability under the Policy.

## BACKGROUND

### I. Procedural Background

On July 1, 1999, CIGNA filed suit against Didimoi and GECC in the United States District Court for the Southern District of New York, seeking a declaration of its rights and obligations with respect to the insurance claim made by Didimoi and GECC on the Policy issued by CIGNA. Approximately nine weeks later, on September 10, 1999, Didimoi and GECC filed suit against CIGNA in this Court seeking interpretation of the same Policy and raising additional related claims. *Didimoi Property Holdings, N.V. v. ACE USA (f/k/a) Cigna Insurance Co.*, Civil Action No. 99–605–JJF.

On March 1, 2000, the District Court for the Southern District of New York entered an Order transferring CIGNA's declaratory judgment action to Delaware. Thereafter, the newly transferred action, *Cigna Insurance Co. v. Didimoi Property Holdings, N.V.*, Civil Action No. 00–186–JJF, was consolidated with the pending action and the newly transferred action was designated as the lead case. (D.I. 55).

On May 31, 2000, the Court conducted a scheduling conference during which the Court directed the parties to consider whether there were any legal issues ripe for judicial resolution. The parties responded with the instant motions seeking a determination as to the scope of the appraisal process and the maximum liability of CIGNA under the Policy. The parties have fully briefed each motion, and the Court has heard oral argument on each motion. Accordingly, these motions are ripe for the Court's resolution.

### II. Factual Background

#### A. *The Parties, The insurance Policy, And The Fire*

On April 2, 1997, a fire occurred on the 14th floor of the Delaware Trust Building located at 900 Market Street, Wilmington, Delaware (the "Building"). The fire started in a tenant file storage room occupying approximately 5,000 square feet of space and burned for eight hours before it was brought under control and extinguished. The fire caused severe damage to the Building rendering it untenable.

The owner of the Building is Didimoi, and the Building's mortgagee is GECC. The Building is insured by CIGNA pursuant to the Policy, and both GECC and Didimoi are policyholders under the Policy.

#### B. *The Adjustment Process Following The Fire*

Following the fire in April 1997, GECC and Didimoi notified CIGNA of the loss sustained to the Building as a result of the fire. Since that date, the parties have attempted to reach an agreement on the amount of loss, including the extent of the fire damage and the cost to repair and/or replace the Building to its pre-fire condition. Despite their disagreement over the amount of loss, CIGNA has paid Didimoi and GECC over $18,000,000 to initiate repairs and $5,000,000 for business interruption.

By letter dated March 18, 1999, CIGNA requested Didimoi and GECC to file a Sworn Statement in Proof of Loss. On

June 1, 1999, Didimoi and GECC submitted its Sworn Statement in Proof of Loss for approximately $92,000,000. By letter dated June 30, 1999, CIGNA rejected the Sworn Statement in Proof of Loss as excessive and invoked the appraisal provision of the Policy to determine the amount of loss. At this time, CIGNA also advanced an additional $5,000,000 toward the repair of the Building.

### C. The Parties' Dispute Over The Appraisal Provision

Although Didimoi and GECC agreed to CIGNA's request for appraisal, the parties sharply dispute the scope of this provision. The appraisal provision at issue provides:

> If we [CIGNA] and you disagree on the value of the property or the amount of loss either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
>
> A. Pay its chosen appraiser; and
>
> B. Bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal, we will still retain our right to deny the claim.

(Policy at 12–13).

By letter dated July 13, 1999, Didimoi and GECC informed CIGNA that they selected Timothy Edelbach, CPA of Deloitte & Touche to act as their appraiser. Thereafter, CIGNA identified its appraiser and forwarded a proposal to Didimoi and GECC for the implementation of the appraisal procedure. On November 5, 1999, Didimoi and GECC responded to CIGNA's proposal for the appraisal process with their own proposal. Although the parties met on December 14, 1999, to resolve their disagreement, the parties were unable to reach a mutually satisfactory resolution.

### D. The Parties' Dispute Over The Maximum Available Coverage

In addition to their dispute over the appraisal provision of the Policy, the parties also dispute the coverage limits available to GECC and Didimoi. CIGNA contends that the maximum amount of coverage available under the Policy is $76,186,163, the "Total Property Value" of the Building in the Schedule of Locations attached to the Policy. GECC and Didimoi contend that in addition to the $76,186.163, the Policy provides for separate additional coverages of $10,000,000 for increased costs of construction due to the application of ordinances or laws and $5,000,000 for debris removal, for a total of $91,186,163 in available insurance coverage.

## DISCUSSION

### I. Cross–Motions For Declaratory Judgment Concerning The Scope Of The Appraisal Clause

#### A. The Parties' Contentions

In disputing the appropriate procedure for the appraisal process, the primary issue raised by the parties is the meaning of the phrase "amount of loss." Essentially, Didimoi and GECC urge the Court to construe the phrase "amount of loss" narrowly to require the appraisers to determine the amount of money necessary to repair or replace the damages claimed, without determining the cause of the damages claimed or the amount of the "covered" loss. In support of their position, Plaintiffs raise four arguments: (1) the plain language and ordinary meaning of the appraisal provision requires the appraisers to set the amount of loss and no language in the provision empowers the appraisers to determine the "cause" of the loss or to ascertain the amount of the "covered" loss; (2) other provisions of the Policy support

the narrow construction of the phrase "amount of loss," because when CIGNA intended the term "amount of loss" to be qualified it explicitly utilized such qualifying terms as "covered cause of loss;" (3) the relevant case law recognizes that whether a claimed item of damage was caused by a covered loss is not an issue for the appraisal process; and (4) CIGNA itself has recognized that causation and other issues related to "amount of loss" are not part of the appraisal process, because CIGNA requested judicial resolution of causation issues in the New York action.

In response, CIGNA contends that Didimoi and GECC's position confuses the concept of determining the scope or amount of loss with the question of coverage. According to CIGNA, the question of "coverage" deals with whether an event, such as a fire, is covered in the first instance, while the question of amount of loss relates to what damage was done by the covered event and the cost to repair that damage. CIGNA does not contest that the Policy covers fire and that a fire has damaged the Building. What CIGNA does contest is the extent of the damage to the Building from the fire. According to CIGNA, the extent of the fire damage is a question concerning the amount of loss, and therefore, the extent of the fire damage is appropriately determined in the appraisal process.

In support of its position, CIGNA raises four arguments: (1) if Didimoi and GECC's position is accepted, the appraisal would be a useless exercise because it would not fix the amount of loss and either party could still contest damages; (2) because Didimoi and GECC's position would allow CIGNA to later contest whether the property was fire-damaged, it contravenes the express prohibition in the appraisal provision against disputing all but coverage; (3) if the phrase "amount of loss" means placing a value on the property regardless of whether it was damaged by fire as Didimoi and GECC contend, then there would be no distinction between the phrases "value of property" and "amount of loss;" and (4)

the case law supports interpreting "amount of loss" to include the extent of the damage. Based on these arguments, CIGNA requests the Court to enter an order requiring the appraisal process to include determinations as to (1) the value of the replacement cost of the Building at the date and time of the fire; (2) the actual cash value of the Building due to the fire loss; (3) the cost to repair and/or replace the fire damage to the Building; (4) the amount of the loss caused by the enforcement of any ordinance or law; (5) the amount of loss to clean up and remove asbestos containing materials and/or asbestos fibers as a result of the fire; (6) the period of time required to repair the Building to its pre-fire condition without regard as to when the construction starts; and (7) the length of time required to complete the work required by the enforcement of any law or ordinance.

### B. *The Applicable Law*

#### 1. Choice of Law

The Policy at issue does not contain a choice of law provision. However, Didimoi and GECC contend that because the Building that sustained the loss is located in Delaware, Delaware law should apply to this action. (D.I. 28 at 9, citing *Whiteside v. New Castle Mut. Ins. Co.*, 595 F.Supp. 1096, 1098 (D.Del.1984)). CIGNA has not contested the application of Delaware law to the parties' dispute. Accordingly, the Court will apply the principles of insurance contract interpretation prescribed under Delaware law.

#### 2. The Interpretation of Insurance Policies under Delaware Law

The interpretation of insurance contracts is a question of law. *Hudson v. State*, 569 A.2d 1168, 1170 (Del.1990). Unless otherwise provided by law, the rights and responsibilities of the parties to an insurance contract are dictated by the terms of the contract. *See Goodman v. Continental Cas. Co.*, 347 A.2d 662 (Del.Super.1975). Accordingly, the first

step in interpreting an insurance contract necessarily focuses on the language of the policy itself.

Insurance policies must be interpreted in the context of examining "all relevant portions of the policy, rather than reading a single passage in isolation." *Aetna Casualty and Surety Co. v. Kenner,* 570 A.2d 1172, 1174 (Del.1990) (citations omitted). If the language of an insurance policy is clear and unambiguous, the parties will be bound by its plain meaning. *Hallowell v. State Farm Mutual Auto. Ins. Co.,* 443 A.2d 925, 926 (Del.1982). Delaware courts will not "destroy or twist the words [of a policy] under the guise of construing them," because "creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented." *Id.* (citations omitted).

■ The language of an insurance policy is not ambiguous merely because the parties raise conflicting interpretations. *E.I. du Pont de Nemours & Company v. Allstate Insurance Co.,* 686 A.2d 152, 156 (Del.1996) (citing *Kenner,* 570 A.2d at 1174). Rather, an ambiguity exists only when there are two or more equally reasonable interpretations of the policy. *Hallowell,* 443 A.2d at 926; *Sherman v. Underwriters at Lloyd's London,* 1999 WL 1223759, * 3 (Del.Super.1999).

■ As a general matter, courts construe ambiguous language in an insurance policy against the drafter of the policy. *Hallowell,* 443 A.2d at 926. This rule of construction is known as the doctrine of contra proferentem. Because the insurer is frequently the drafter of the policy and the policy is a contract of adhesion, courts often interpret insurance policies against the insurer. *Id.* However, where the insured negotiates or drafts the policy, the doctrine of contra proferentem will apply so that the ambiguous language is construed against the insured. While it is frequently the case that insureds who draft or select policy language are large, sophis-

ticated corporate insureds, the wealth and size of the insured is not relevant. Rather, the crucial inquiry in applying the doctrine of contra proferentem is who drafted or selected the policy language. *New Castle County v. Hartford Acc. & Indem. Co.,* 933 F.2d 1162, 1189 (3d Cir.1991); *see also Eastern Assoc. Coal Corp. v. Aetna Cas. & Sur. Co.,* 632 F.2d 1068, 1075 (3d Cir.1980) (applying Pennsylvania law which is virtually identical to Delaware law on this issue and holding that ambiguous contract should be construed against insured where insured's broker selected policy forms, prepared policies and sent them to insurer for execution); *Black's Law Dictionary* 327 (6th ed. 1990) (defining "contra proferentem" as construing ambiguous provisions against person who "selected" language).

## C. *The Meaning of The Term "Amount of Loss"*

■ The parties' disagreement concerning the scope of the appraisal centers on the meaning of the phrase "amount of loss." Specifically, the parties disagree on whether determining the "amount of loss" includes determining the cause of the loss. After reading the appraisal clause in the context of the Policy as a whole, the Court concludes that the phrase "amount of loss" is not ambiguous, because it is susceptible to only one reasonable interpretation in this context. Specifically, the Court concludes that in the insurance context, an appraiser's assessment of the "amount of loss" necessarily includes a determination of the cause of the loss, as well as the amount it would cost to repair that which was lost. The Court's conclusion in this regard is consistent with the plain meaning of the terms "amount of loss" and "loss" in the insurance context. For example, Black's Law Dictionary defines the term "amount of loss" as "the diminution, destruction, or defeat of the value of, or of the charge upon, the insured subject to the assured, *by the direct consequence of the operation of the risk insured against,* according to its value in the policy, or in contribution for loss, so far as its value is

covered by the insurance." *Black's Law Dictionary, supra* at 83 (emphasis added). Thus, the definition provided by Black's expressly includes a causation element.

Although Webster's Dictionary does not define the phrase "amount of loss," Webster's definition of the word "loss" is consistent with the definition of "amount of loss" in Black's. In the context of insurance, Webster's Dictionary defines "loss" as "the amount of an insured's financial detriment by death or damage *that the insurer becomes liable for.*" *Webster's Collegiate Dictionary* 706 (9th ed. 1988) (emphasis added). As a general matter, without regard to specific legal exceptions created in a policy, an insurer is only liable for damage caused by the risk insured against. Thus, in the Court's view, the Webster's definition of "loss" for purposes of insurance expressly contemplates causation.

Didimoi and GECC contend that the "plain language" of the appraisal provision supports their position, because the terms "amount of loss" and "loss" are not qualified in the policy with limiting words like "covered loss." Thus, Didimoi and GECC urge the Court not to rewrite the policy to supply an omission. However, as the Court has discussed, the plain and common meaning of the terms "amount of loss" and "loss" in the insurance context includes a causation element. The Court cannot add that which is already included in the plain meaning of these terms. Accordingly, the Court's interpretation of these terms merely effectuates their plain and ordinary meaning as they are used in the context of insurance.

Didimoi and GECC also contend that an interpretation of "amount of loss" and "loss" which includes causation would render CIGNA's reservation of rights in the appraisal clause meaningless. The Court disagrees with Didimoi and GECC and believes that Didimoi and GECC's argument confuses two concepts: amount of loss and coverage. The meaning of the term "coverage" is "narrow and precise."

15 *Couch on Insurance* § 212:12. Coverage is "the assumption of the risk of occurrence of the event insured against before its occurrence." *Id.* Coverage issues include such questions as who is insured, what type of risk is insured against, and whether an insurance contract exists. *Id.* CIGNA's reservation of rights is not meaningless, because CIGNA, as well as the insured, may still dispute coverage issues after an appraisal has been conducted. However, as CIGNA recognizes in its Opening Brief, it may not contest the decision on amount of loss reached by the umpire and at least one of the appraisers as a result of the appraisal process. (D.I. 33 at 10). Accordingly, the Court's interpretation of "loss" and "amount of loss" does not render CIGNA's reservation of rights meaningless.

As for the case law cited by the parties, it is evident to the Court that there is a split of authority on this issue with some cases squarely holding that the appraisers may not consider causation, some cases squarely holding that the appraisers may consider causation, and still some cases expressing a more ambiguous view. For example, in *Wells v. American States Preferred Ins. Co.*, 919 S.W.2d 679, 683 (Tex. App.1996), the Texas appellate court squarely concluded that causation determinations were not appropriately made by appraisers during the appraisal process. In *Wells*, the Wellses home sustained damage due to foundation movement; however, the Wellses also discovered a leak in the plumbing under the foundation. The Wellses insurance policy insured their dwelling against foundation and structural damage caused by leaks in the plumbing system. *Id.* at 680–681. The Wellses made a claim under their homeowner's insurance policy, and the insurance company denied the claim on the basis that the plumbing leak did not cause the foundation movement and demanded an appraisal. *Id.* at 681. Under an appraisal clause similar to the appraisal clause in this case, two appraisers and an umpire were selected to ascer-

tain the amount of loss. Both appraisers and the umpire unanimously agreed that the damage to the Wellses home due to foundation movement amounted to $22,-875.94. *Id.* at 682. However, one appraiser and the umpire agreed that the damage to the dwelling related to the plumbing leak was zero. *Id.* Reversing the trial court's grant of summary judgment in favor of the insurance company, the Texas appellate court concluded that the appraisal section of the policy authorized the appraisers "to determine the dollar amount of the insured's loss only," and that it did not authorize or empower the appraisal panel to determine "what caused or did not cause that loss." *Id.* at 685. According to the Texas court, "appraisers have no power or authority to determine questions of causation, coverage, or liability," absent an agreement between the insured and the policyholder to the contrary. *Id.* at 684. In reaching this conclusion; however, the Texas court relied on the "weight of authority from other jurisdictions" without considering those cases which expressed a contrary view.

While other cases cited by Didimoi and GECC arguably support their decision, they are not as definitive on this question as the *Wells* decision. For example, in *Kawa v. Nationwide Mut. Fire Ins. Co.*, 174 Misc.2d 407, 664 N.Y.S.2d 430 (N.Y.Sup.Ct.1997), the policyholders' residence was damaged by a windstorm. The policyholders maintained that the insurance company was required to replace all of their aluminum siding with new vinyl siding and that an appraisal was the appropriate procedure for resolution of the dispute. The insurer maintained that the issue presented was not an amount of loss dispute, but a coverage dispute which was properly resolved by the court. *Id.* 664 N.Y.S.2d at 431. To this effect the insurer maintained that the damage was not the result of the windstorm but was caused by commonly excluded perils such as "age, wear and tear and/or poor or improper maintenance." *Id.* Agreeing with the insurer, the court held that the parties' dispute

went to coverage under the policy. Thus, while *Kawa* could be read broadly to support the concept that causation should not be determined in an appraisal, a more narrow reading of the *Kawa* court's holding is that appraisers cannot determine such coverage questions as whether the damage claimed by an insured falls under a policy exclusion. In other words, read narrowly *Kawa* does not address the question in this case, i.e. the scope or extent of the damage caused by an admittedly covered peril. Rather, the *Kawa* court addressed a question not yet raised in this case, i.e. a coverage question of whether the damage claimed was the result of an excluded peril.

Didimoi and GECC also cite to *Auto-Owners Insurance Company v. Kwaiser*, 190 Mich.App. 482, 476 N.W.2d 467 (1991), to support their position that causation is not to be determined in an appraisal. However, like the *Kawa* decision, the *Kwaiser* decision is not as clear on this issue as the *Wells* decision. Indeed, while Didimoi and GECC's reading of *Kwaiser* is plausible, the Court believes that a closer reading of *Kwaiser* actually supports CIGNA's position. In *Kwaiser*, the roof over the living room of the Kwaisers' mobile home collapsed because of heavy rain. An engineer hired by the insurance company discovered that the structure of the entire roof was rotted because of long term trapped moisture, and therefore, any repair would involve the replacement of the entire roof. 476 N.W.2d at 468. The insurance company demanded an appraisal under the policy. Like the appraisal clause in this case, two appraisers and an umpire were selected to determine the amount of loss. The appraisers determined that the amount of loss equaled the cost of replacing the entire roof. The insurance company filed a declaratory judgment action seeking to resubmit the matter for appraisal after a clarification of the insurer's liability. *Id.* Specifically, the insurer contended that the appraisers should have considered the policy exclusions for neglect and wear and

tear in reaching their conclusions. *Id.* at 469. Concluding that determinations of whether claimed damage falls within a policy exclusion is a coverage question, the court held that the appraisers did not err, but that the matter should be remanded to the trial court for a determination of the policy's coverage and the insurer's liability.

While the Court understands Didimoi and GECC's reliance on *Kwaiser*, the Court again believes that Didimoi and GECC's interpretation of that case is based on a confusion between "coverage" and "amount of loss." Unlike the instant case, the parties in *Kwaiser* did not merely contest the scope or extent of the damage, rather the parties in *Kwaiser* raised the issue of whether that damage was excluded under the policy. Because questions involving the application of policy exclusions are legal questions concerning liability and coverage, they are not, as the *Kwaiser* court correctly concluded, within the appraiser's authority.

Added to this mix of authority are those cases cited by CIGNA, some of which squarely stand for the proposition that causation must be considered in the appraisal process. For example, in *Florida Farm Bureau Casualty Ins. Co. v. Sheaffer*, 687 So.2d 1331 (Fla.Ct.App.1997), the Sheaffers sought recovery under their homeowner's policy for damages to the tile roof of their home caused by hurricanes. The Sheaffers sought replacement of the entire roof, because they could not obtain tiles to match the existing tiles on the roof. *Id.* at 1332. The insurer denied the Sheaffers claim, maintaining that the roof could be repaired by replacing only the damaged and missing tiles, even if the replacement tiles were not consistent with the existing tiles. Like Didimoi and GECC in this case, the Sheaffers argued that the appraisal process was limited to a determination of how much it would cost to replace the roof, and that the question of whether the entire roof should be replaced was a "coverage" question requiring judicial construction of the policy language. *Id.* Disagreeing with

the Sheaffers, the court concluded that there was no coverage dispute between the parties, but simply a dispute related to the amount of loss. Adopting the reasoning in a previous Florida case, the Sheaffer court held:

"Where the amount owed on a claim, arguably within the policy coverage, is dependent on the resolution of disputed issues of fact and the application of policy language to those facts . . . the extent of the claim does not constitute a 'coverage' question."

Thus, once it is either admitted that the claim is within the class of claims covered by the policy, or the trial court makes that determination,

"whether the claimant is actually entitled under the facts of the case to be paid on a claim and, if so, the precise amount to which the claimant is entitled, is a question reserved for the arbitrator [or appraiser]."

at 1334 (citing *J.J.F. of Palm Beach, Inc. v. State Farm Fire and Cas. Co.*, 634 So.2d 1089, 1090 (Fla.4th DCS 1994)). Thus, unlike the *Wells* court, the *Sheaffer* court concluded that causation questions were appropriately determined in the appraisal process.

Similarly, in *Wausau Insurance Co. v. Herbert Halperin Distribution Corp.*, 664 F.Supp. 987, 988 (D.Md.1987), the United States District Court for the District of Maryland flatly rejected an argument similar to Didimoi and GECC's argument that "the only issue subject to appraisal is the monetary valuation of items which the parties agree are covered by the policy." In *Wausau*, a portion of the insureds' roof collapsed. An inspection by an independent consulting firm concluded that the collapsed areas were rotten and decayed by fungus and mold due to long-term exposure to moisture. *Id.* at 988. The insureds sought payment for the repair and replacement of the entire roof, because it was structurally impossible to repair one area alone. The insurer contended that it was only liable for the immediate and direct

damage from the partial collapse of the roof, because of exclusions in the policy for damage caused by faulty design, construction or operational deterioration and wear and tear. Like the courts in *Kawa* and *Kwaiser*, the *Wausau* court concluded that the issue of whether policy exclusions apply so as to limit coverage are questions for the court, not the appraisal process. However, in so concluding, the *Wausau* court expressly rejected the position taken by Didimoi and GECC in this case, that the only issue subject to appraisal is the monetary valuation of items. According to the *Wausau* court, "[t]o so read the appraisal clause would make the term 'amount of loss' simply redundant to the term 'the actual cash value.' " *Id.* at 988.

As far as Delaware law is concerned, Didimoi and GECC contend that Delaware courts follow the approach taken by the *Wells* court, i.e. that causation should not be determined in the appraisal process.[2] In support of their position Didimoi and GECC rely on *Hanby v. Maryland Cas. Co.*, 265 A.2d 28 (Del.1970) and *Pullman Incorporated v. Phoenix Steel Corporation*, 304 A.2d 334 (Del.Super.1973). As Didimoi and GECC accurately quote, the *Hanby* court stated that "[a]ppraisal will determine the amount of loss and the Court then may be called upon to determine what effect should be given to the findings of the appraisers." However, the Court does not find the *Hanby* court's statement to be dispositive. The *Hanby* court's statement was made in the context of determining whether the appraisal procedure deprived the Delaware court of jurisdiction. The *Hanby* court did not define "amount of loss" and in fact, was not called upon to define "amount of loss." Accordingly, the Court does not read *Hanby* to evidence a clear view of the Delaware courts' approach to this issue.

Similarly, Didimoi and GECC correctly quote the *Pullman* court as stating that "appraisal extends only to a determination of actual cash value, all other issues being reserved for decision by a court." 304 A.2d at 339 (citing 5 Am.Jur.2d *Arbitration and Award* § 3 at 520–521). However, like the *Hanby* court, the *Pullman* court was not called upon to define "amount of loss." Rather, the *Pullman* court's statement was made in the context of generally distinguishing between arbitration and appraisal and was not the product of an in-depth review of the appraisal process, its scope and its purpose in insurance law. Accordingly, the Court finds the *Pullman* court's statement to be non-dispositive dicta.

Given the lack of Delaware authority on this point and the mix of persuasive authority from other jurisdictions, the Court is hesitant to make a sweeping statement aligning itself with one or another camp. This having been said, the Court believes that under the circumstances of this case, including the plain language of the policy, a determination of amount of loss under the appraisal clause includes a determination of causation. Coverage questions, such as whether damage is excluded for reasons beyond fire damage, are legal questions for the Court as this case progresses. However, the Court believes that whether a particular item was damaged as a result of fire or firefighting efforts is appropriately reserved for the appraisal process.

Indeed, under the circumstances of this case, the Court cannot reconcile any other approach. Carried to its logical conclusion, Didimoi and GECC's position would be nonsensical. If the appraisers were required to accept the insured's claimed damages regardless of their cause and assign only dollar value assessments of the cost to repair or replace the items of claimed damage, the appraisers could be

**2.** Didimoi and GECC refer to the *Wells* court's approach as the "majority view." Given the definite split of authority between cases like *Sheaffer* and *Wells* and the lack of clarity as far as other cases are concerned like *Kawa* and *Kwaiser,* the Court is hesitant to refer to one approach as a "majority view."

examining damage entirely unrelated to this case. For example, the insured could claim damage that resulted from an office party months ago and the appraisers would be required to assess a repair or replacement cost for that damage, when clearly such damage was not caused by the fire and would not be remotely relevant to this dispute. The Court cannot conclude that this is the appropriate function of the appraisal process.

The Court understands that the damages in this case are not as clear as the Court's above illustration. For example, a major issue in this case concerns damage to the Building by asbestos and microbial agents. At the time of the fire, the Building was undergoing asbestos removal. While the asbestos had been removed from much of the Building, it had not been removed from the 14th floor where the fire occurred. The smoke, soot and firefighting water distributed the asbestos throughout the Building. In addition, the air handling equipment remained on during much of the time the fire burned causing further disbursement of the asbestos fibers. After the fire, the wet materials were not promptly removed from the Building causing the growth of mold, mildew and other microbial agents. In this litigation, CIGNA contends that the asbestos and microbial problems were pre-existing conditions excluded from coverage under the policy. Didimoi and GECC contend that such problems as microbial growth resulted from CIGNA's refusal to allow Didimoi to remove the wet materials from the Building. While the Court understands the overlap between these issues and causation which is the root of the dispute in this case, the Court believes that the ultimate question of whether CIGNA is responsible for this damage or whether this damage is excluded under the Policy is a coverage question which requires judicial resolution. Indeed, to the extent that the appraisers' assessment may overlap with a coverage question, the parties certainly may seek the Court's ultimate review. However, the Court believes it would be inappropriate to curtail the appraisal process simply because it might come shoulder-to-shoulder with subsequent legal questions.

As a general matter, public policy favors alternate resolution procedures like the appraisal process. *See generally Devaney v. Nationwide Mutual Insurance Company,* 679 A.2d 71, 75 (Del.1996); Couch, *supra* at § 209:17. If the Court were to curtail the appraisers authority to include only dollar value assessments without regard for whether the property was damaged as a result of the fire, the Court would be reserving a plethora of detailed damage assessments for judicial review, thereby debunking the purpose of appraisal which is to minimize the need for judicial intervention. Couch, *supra* at § 209:8 ("Like the arbitration remedy, appraisal is designed to be·consistent with the public policy of discouraging litigation."). Moreover, the Court believes that its approach to the appraisal process may foster the parties' resolution of certain issues without legal intervention, thereby promoting the purpose of appraisal. *Id.* For example, the appraisal may assist the parties in narrowing and identifying the disputed issues thereby encouraging the parties to attempt a resolution of those matters before seeking the Court's intervention.

In sum, the Court declines to adopt Didimoi and GECC's approach to the appraisal process which would limit the process to the mere assessment of dollar values for repair and replacement. Given the plain language of the policy, the plain and ordinary meaning of such phrases as "amount of loss" and "loss" and the public policy favoring alternate dispute resolution procedures like appraisal, the Court concludes that under the circumstances of this case, the appraisal process should include a determination of whether the claimed damage was caused by the fire.

D. *The Specific Scope Of The Appraisal*

Having concluded that determining the amount of loss requires the appraisers to

determine whether the damage claimed was caused by the fire, the Court must turn to the remaining issues raised by the parties. Specifically, CIGNA requests the appraisal process to include seven determinations: (1) the value of the replacement cost of the Building at the date and time of the fire; (2) the actual value of the Building due to the fire loss; (3) the cost to repair and/or replace the fire damage to the Building; (4) the amount of the loss caused by the enforcement of any ordinance or law; (5) the amount of loss to clean up and remove asbestos containing materials and/or asbestos fibers as a result of the fire; (6) the period of time required to repair the Building to its pre-fire condition without regard as to when the construction actually starts; and (7) the length of time required to complete the work required by the enforcement of any ordinance or law. In addition, CIGNA requests the Court to enter an Order adopting its six-page, 20 paragraph proposed procedure for the appraisal process.

### 1. Replacement Cost of the Building

To the extent that CIGNA seeks a determination as to the cost to repair or replace the damage claimed by the policyholders, Didimoi and GECC agree that replacement cost should be determined by the appraisal. (D.I. 40 at 17). However, Didimoi and GECC contest CIGNA's position that the appraisal should include a determination of the value of the replacement cost of the Building at the date and time of the fire to the extent that CIGNA's position incorporates a causation determination.

■ It is widely recognized that appraisers may determine the replacement cost of a building, where replacement cost is a measure of the insurer's liability under the policy. *See e.g. Unetco Indus. Exch. v. Homestead Ins. Co.,* 57 Cal.App.4th 1459, 67 Cal.Rptr.2d 784 (1997). In this case, the policy contemplates that the insurer may pay the cost of replacing the lost or damaged property. (Policy at 13). To the extent

that the appraisers may need to consider whether the damage was caused by fire in assessing the replacement cost of the Building, the Court concludes that such causation determinations are appropriate for the reasons discussed previously. Accordingly, the Court will order the appraisers to determine the replacement cost of the Building.

### 2. Actual Cash Value of the Building

■ Didimoi and GECC contend that the determination of the actual cash value of the Building should not be included in the scope of the appraisal process. According to Didimoi and GECC they elected coverage for repair or replacement cost of the Building, not for the Building's actual cash value, and therefore, the actual cash value of the Building is irrelevant. Although CIGNA does not specifically respond to Didimoi and GECC's argument, it is evident from its submissions that CIGNA believes that the appraisal should include a determination of the actual cash value of the Building.

In support of their position that actual cash value is irrelevant, Didimoi and GECC direct the Court to that portion of the Policy which allows the insured to "make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis." (Policy at 15). Didimoi and GECC further point out that the appraisal clause states: "If we and you disagree on the value of the property *or* the amount of loss, either may make a written demand for an appraisal of the loss." (D.I. 40 at 15 (citing Policy at 12), emphasis in original). According to Didimoi and GECC, the appraiser's authority to set the actual cash value of the property has not been triggered, because there is no disagreement over the value of the property since Didimoi and GECC opted for coverage for repair/replacement cost.

The Court disagrees with Didimoi and GECC's reading of the Policy. First, there is nothing in the insured's election

provision which restricts or prevents the insurance company from seeking a determination of the actual cash value of the Building. Second, although the appraisal provision is triggered by a dispute over either "the value of the property or the amount of loss," once the appraisal process is triggered the clause requires the appraisers to "state separately the value of the property *and* [the] amount of loss." (Ex. A at 12, emphasis added). Accordingly, the Court will order the appraisal to include a determination of the actual cash value of the Building.

### 3. The Cost To Repair Or Replace The Fire Damage In the Building

It appears to the Court that Didimoi and GECC contest CIGNA's request for the appraisal to include a determination of the repair or replacement cost of the fire damage in the building on the grounds that this determination includes causation. Because the Court has previously concluded that it is appropriate for the appraisers to consider whether the damage was caused by the fire, the Court will order the appraisers to consider the cost to repair or replace the fire damage in the Building.

### 4. Increased Costs Associated with Requirements of Ordinance or Law

Didimoi and GECC do not contest CIGNA's request that the appraisal process include a determination of the increased cost to repair or replace the damage caused by the enforcement of any ordinance or law. Accordingly, the Court will require the appraisers to make this determination.

### 5. The Amount of Loss to Clean Up and Remove Asbestos Containing Materials And/Or Asbestos Fibers as a Result of the Fire

It appears to the Court that the parties address this issue in their respective briefs under the heading "Costs Associated With Specific Causes." Consistent with their position that the appraisers should not consider causation in making their assessments, Didimoi and GECC contend that it is inappropriate for the appraisers to determine the cause of the appraised damage and then assign monetary values to specific causes. Because the Court has previously concluded that the appraisers may consider whether the damage claimed was caused by the fire, the Court will permit the appraisers to determine the amount of loss to clean up and remove the asbestos containing material to the extent that the appraisers determine that this damage was caused by the fire. However, the Court will not allow the appraisers to determine whether this damage, if caused by the fire, is otherwise limited or excluded from the Policy's coverage as this question is a question of CIGNA's ultimate liability which is reserved for judicial determination.

### 6. Time Element Loss and Amount of Time Needed To Effectuate Repair

Under the heading "Time Element Loss and Amount of Time Needed to Effectuate Repairs," CIGNA argues that the appraisers should determine (1) the period of time required to repair the Building to its pre-fire condition without regard as to when the construction actually starts, and (2) the length of time required to complete the work required by the enforcement of any ordinance or law. Although it is not entirely clear from CIGNA's argument, it appears to the Court that CIGNA's argument refers to the Policy's loss of income coverage.

To the extent that this issue implicates causation, Didimoi and GECC argue that this determination should not be included in the appraisal process. Didimoi and GECC also contend that CIGNA should not be allowed to have the appraisers factor in costs associated with delays in repairs in determining CIGNA's ultimate liability under the policy because CIGNA has obstructed and delayed Didimoi and GECC's efforts to restore the Building to a usable condition.

Although the Court can locate no authority addressing the precise issue of whether it is appropriate for appraisers to consider the amount of time needed to effectuate repairs, it appears that several courts, including this Court, have implicitly recognized that appraisers may consider the amount of time needed to effectuate repairs in assessing lost income claims. *See generally Northeast Fin. Corp. v. Insurance of North Am.*, 757 F.Supp. 381 (D.Del.1991); *Lakewood Mfg. Co. v. Home Ins. Co.*, 24 Ohio Misc. 244, 422 F.2d 796 (6th Cir.), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970). Accordingly, the Court will allow the appraisers to determine the amount of time it will take to repair or replace the Building to its pre-fire condition and the amount of time required to make repairs resulting from the enforcement of any applicable laws or ordinances.

As for the impact, if any, of the alleged delays and obstructions by CIGNA on CIGNA's liability under the Policy, such questions were not thoroughly presented and raised by the parties within the scope of the instant motions. Accordingly, the Court leaves these issues for later briefing and resolution should the parties so desire.

### 7. CIGNA's Proposed Procedure for the Appraisal Process

In addition to requesting the Court to order the appraisal to include the foregoing substantive determinations, CIGNA also requests the Court to adopt its six-page, 20 paragraph proposed procedure for the appraisal process. In response to CIGNA's request, Didimoi and GECC contend that it is premature to address the issue of what procedures to follow. Nevertheless, Didimoi and GECC have submitted an alternate proposal for the appraisal process should the Court agree to consider the issue.

At this juncture and in the interest of allowing the parties an opportunity to work out their differences concerning the procedures of the appraisal process in light of the Court's rulings, the Court will not enter the order requested by CIGNA adopting CIGNA's proposal. However, should the parties fail to agree to the procedural aspect of the appraisal, the parties shall submit one joint proposal outlining those procedures which have been agreed to and highlighting those procedures which are in dispute. In addition, the parties may submit a brief letter memorandum (no more than 5 pages) concerning their respective positions on the disputed procedures.

## II. Cross–Motions For Declaratory Judgment Concerning The Maximum Amount Of Coverage Available Under The Policy

### A. *The Parties' Contentions*

In arguing that the total amount of coverage available under the policy is $91,-186,163, a sum arrived at by adding the additional coverages of $10,000,000 for increased costs of construction due to applicable laws and ordinances and $5,000,000 for debris removal to the $76,186,163 all perils coverage, GECC and Didimoi focus on the construction of the Limits Endorsement attached to the front of the Policy. In pertinent part, the Limits Endorsement provides:

SCHEDULED LOCATIONS AND LIMITS
ENDORSEMENT

Locations:  As per schedule on file with the company.

| Limits: | $25,000,000 | Per location, or as scheduled, all perils, *except:* |
|---|---|---|
| | | *** |
| | $10,000,000 | Per occurrence on ordinance or law |
| | $5,000,000 | Per occurrence on debris removal |

(emphasis added).

The parties agree that the scheduled amount of recovery for the Building is $76,186,163. However, focusing on the meaning of the word "except" in the Limits Endorsement, Didimoi and GECC contend that the plain meaning of the word "except" requires the Court to conclude

that the limits for costs incurred due to the application of ordinances or laws and for debris removal are not included in the $76,186,163 all perils scheduled limit. GECC and Didimoi contend that CIGNA's argument that the $10,000,000 and $5,000,000 sums are included in the $76,186,163 all perils limit reads the word "except" to mean including, which is the exact opposite of its ordinary meaning.

In response to GECC and Didimoi's argument and in support of its position that the maximum amount of coverage under the policy is $76,186,163, CIGNA contends that the Court should focus on the Limits of Insurance provision in the Policy. In pertinent part, the Limits of Insurance provision provides:

> D. Limits Of Insurance
> The most we will pay for loss or damage in any one occurrence is the applicable limit of insurance shown in the declarations.
> The limits applicable to the coverage extensions and the pollutant clean up and removal brands and labels additional coverages are in addition to the limits of insurance shown in the declarations. Payments under the following Additional Coverages will not increase the applicable limit of insurance:
> 1. ... ordinance or law coverage ...
> 2. Debris removal ...

(Policy at 9).

CIGNA contends that the plain meaning of the Limits of Insurance provision requires the Court to conclude that only coverage extensions "are in addition to the limits of insurance shown in the declarations," and that the additional coverages are included in the scheduled all perils coverage limit. To this effect, CIGNA points out that the plain language of the Limits of Insurance provision states that

additional coverages like debris removal and increased construction costs due to laws and ordinance "will not increase the applicable limit of insurance." (Policy at 9).

In the alternative, CIGNA also argues that even if the Court chooses to focus on the Limits Endorsement rather than the Limits of Insurance provision in the Policy, GECC and Didimoi's reading of the Limits Endorsement is incorrect. CIGNA contends that the word "except" does not mean "in addition to" or "plus" and that the focus of the Endorsement is the word "limit." According to CIGNA, the Limits Endorsement limits coverage for debris removal and ordinance compliance to $15,000,000 and does not represent an "increase in limits."

## B. *The Maximum Amount of Coverage Available Under The Policy*

■ Applying the principles of construction set forth previously, the Court must determine whether the $76,186,163 of all perils coverage includes the $10,000,000 coverage for ordinance or law requirements and $5,000,000 coverage for debris removal costs. The Court will begin its analysis with an examination of the Limits Endorsement.

The disputed portion of the Limits Endorsement concerns the meaning of the word "except." Under Delaware law, the language of an insurance policy is only ambiguous when there are two or more equally reasonable interpretations of the language. *Hallowell*, 443 A.2d at 926; *Sherman*, 1999 WL 1223759 at *3. After reviewing the parties arguments in the context of the Policy as a whole, the Court concludes that the word "except" is not ambiguous, because it is susceptible to only one reasonable interpretation in this context.[3] Specifically, the Court concludes

---

3. In disputing the meaning of the word "except," CIGNA does not expressly contend that the term is ambiguous, but only that the plain meaning of the term is not the meaning suggested by Didimoi and GECC. However, to

the extent that CIGNA's argument concerning the Limits Provision of the Policy is aimed at creating an ambiguity as to the word "except," the Court rejects CIGNA's argument. As discussed infra, CIGNA's argument con-

that the word "except" means "not including."

Because the Court concludes that the word "except" is not ambiguous, the parties are bound by its plain meaning. The Court's construction of the word "except" is consistent with its ordinary dictionary definitions. For example, Webster's Ninth New Collegiate Dictionary defines the word "except" to mean "with the exclusion or exception of" or "to take or leave out from a number or a whole." *Webster's, supra* at 432. Similarly, Black's Law Dictionary defines "except" to mean "not including; other than; otherwise than, to leave out of account or consideration." *Black's Law Dictionary, supra* at 559. Applying the plain and ordinary meaning of the word "except" to the Limits Endorsement, the Court concludes that the $15,000,000 in coverage for ordinance and law compliance and debris removal is not included in the scheduled amount of $76,186,163, and therefore, the $15,000,000 coverage is in addition to the $76,186,163.

To the extent that CIGNA argues that the Limits of Insurance provision of the Policy requires the available coverage to be capped at $76,186,163, the Court disagrees with CIGNA. The Limits of Insurance provision does not answer the question of what is the maximum amount of coverage available under the Policy. Rather, by its express terms, the Limits of Insurance provision directs the reader to "the applicable limit of insurance shown in the Declarations." The Declarations Page of the Policy sets forth a single limit of liability in the sum of $25,000,000 and expressly states that it is "subject to" the "schedule of forms and endorsements." Thus, to determine "the applicable limit of insurance" referred to in the Limits of Insurance provision of the Policy, one must necessarily consider the Limits Endorsement.

CIGNA also argues that the Limits of Insurance provision requires additional coverages like coverage for ordinance compliance and debris removal to be treated differently from extensions of coverage. To this effect, CIGNA contends that the Limits of Insurance provision requires the additional coverages related to ordinance compliance and debris removal to be sublimits of the scheduled all perils amounts. There are two difficulties with CIGNA's argument. First, if CIGNA's reading of the Limits of Insurance provision is correct, the Court would be required to construe the word "except" in the Limits Endorsement to mean "including"—a definition which is exactly opposite of its plain and ordinary meaning—in order to avoid a conflict between the Limits Endorsement and the Limits of Insurance provision. Under Delaware law, insurance contracts should be construed in accordance with a reasonable reading of the contract's plain language. *See e.g. E.I. du Pont de Nemours & Co.,* 686 A.2d at 156. Because the Court cannot conclude that such a tortured definition of "except" is reasonable, the Court cannot accept CIGNA's argument.

Second, if the Court were to accept CIGNA's position without altering the plain meaning of the word "except," there would be a conflict between the Limits Endorsement and the Limits of Insurance provision in the Policy. The Limits Endorsement makes no distinction between additional coverage and extensions of coverage, but rather treats both types as "excepted" from the $76,186,163 scheduled all perils amount. Where there is a conflict between the body of a policy and the language of an endorsement, courts have generally recognized that the language of the endorsement controls. *See e.g. O'Hanlon v.*

---

cerning the Limits Provision would require the Court to accept a construction of the word "except" which is entirely at odds with the word's meaning. To find an ambiguity, there must be two reasonable interpretations of a disputed term. Because the ambiguity that would be created as a result of CIGNA's reading of the Limits Provision would create such a distorted meaning of the word "except," the Court declines to read the Limits Provision to create an ambiguity.

*Hartford Accident and Indemnity Co.*, 639 F.2d 1019, 1023, n. 8 (3d Cir.1981); *St. Paul Fire & Marine Ins. Co. v. U.S. Fire Ins. Co.*, 655 F.2d 521, 523 (3d Cir.1981); *Mutual Benefit Life Ins. Co. of Newark v. Bailey*, 190 A.2d 757, 759 (Del.1963). Further, the Policy at issue expressly provides: "This policy's terms can be amended or waived only by endorsement issued by us and made part of this policy." Thus, the Policy itself confirms that the Limits Endorsement takes precedence over the body of the Policy.

As the Court has previously concluded, the language of the Limits Endorsement "excepts" or "does not include" the additional $15,000,000 for debris removal and ordinance compliance in the scheduled sum of $76,186,163. Accordingly, the Court concludes that $91,186,163 in coverage is available for the Building under the Policy.

## CONCLUSION

For the reasons set forth below, CIGNA's Cross–Motion For Declaratory Judgment on the scope of the appraisal will be granted and Didimoi and GECC's Cross–Motion For Declaratory Judgment on the scope of the appraisal will be denied. Further, Didimoi and GECC's Cross–Motion For Declaratory Judgment on the maximum liability of CIGNA under the Policy will be granted and CIGNA's Cross–Motion For Declaratory Judgment on the maximum liability of CIGNA under the Policy will be denied. Consistent with these rulings, the Court will enter an Order requiring the appraisers to determine (1) the value of the replacement cost of the Building at the date and time of the fire; (2) the actual cash value of the Building due to the fire loss; (3) the cost to repair and/or replace the fire damage to the Building; (4) the amount of the loss caused by the enforcement of any ordinance or law; (5) the amount of loss to clean up and remove asbestos containing materials and/or asbestos fibers as a result of the fire; (6) the period of time required to repair the Building to its pre-fire condition

without regard as to when the construction starts; and (7) the length of time required to complete the work required by the enforcement of any law or ordinance. As for the maximum liability of CIGNA under the Policy, the Court will enter an Order setting forth the sum of $91,186,163 as the maximum liability under the Policy.

An appropriate Order will be entered.

## ORDER

At Wilmington, this *11* day of August 2000, for the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED that:

1. CIGNA Insurance Company's ("CIGNA") Cross–Motion For Declaratory Judgment on the scope of the appraisal (D.I. 32) is GRANTED.

2. Didimoi Property Holdings, N.V. ("Didimoi") and General Electric Capital Corporation's ("GECC") Cross–Motion For Declaratory Judgment on the scope of the appraisal (D.I. 27) is DENIED.

3. The appraisers shall make determinations as to the following:

(a) the value of the replacement cost of the Delaware Trust Building (the "Building") at the date and time of the fire;

(b) the actual cash value of the Building due to the fire loss;

(c) the cost to repair and/or replace the fire damage to the Building;

(d) the amount of the loss caused by the enforcement of any ordinance or law;

(e) the amount of loss to clean up and remove asbestos containing materials and/or asbestos fibers as a result of the fire;

(f) the period of time required to repair the Building to its pre-fire condition without regard as to when the construction starts; and

(g) the length of time required to complete the work required by the enforcement of any law or ordinance.

4. Didimoi and GECC's Cross–Motion For Declaratory Judgment on the maximum liability of CIGNA under Insurance Policy No. FSU D33679449 (D.I. 62) is GRANTED.

5. CIGNA's Cross–Motion For Declaratory Judgment on the maximum liability under Insurance Policy No. FSU D33679449 (D.I. 64) is DENIED.

6. The maximum liability of CIGNA under Insurance Policy No. FSU D33679449 for the claim filed by Didimoi and GECC for the damage sustained to the Delaware Trust Building is $91,186,163.